## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

NINA HOHMAN,

     *Plaintiff,*

v.                   CASE NO. 12-CV-12646

COMMISSIONER OF         DISTRICT JUDGE JOHN CORBETT O'MEARA
SOCIAL SECURITY,        MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 12.)

Plaintiff Nina Sue Hohman was 39 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 39.) Plaintiff's employment history includes work as a waitress for one year, a restaurant hostess/cashier for one year, an assistant manager of a restaurant for less than one year, a fast food worker for less than one year, and a security guard in a jail for four years. (Tr. at 127.) Plaintiff filed the instant claims on August 4, 2009, alleging that she became unable to work on June 8, 20005. (Tr. at 107, 114.) The claims were denied at the initial administrative stages. (Tr. at 49, 50.) In denying Plaintiff's claims, the Commissioner considered anxiety-related disorders and disorders of back, discogenic and degenerative, as possible bases for disability. (*Id.*) On December 15, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Andrew G. Sloss, who considered the application for benefits *de novo*. (Tr. at 20-35, 36-48.) In a decision dated October 26, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 31.) Plaintiff requested a review of this decision on January 20, 2011. (Tr. at 18-19.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on June 6, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On June 18, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

## B.    Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making

a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party");
*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

Judicial review of the ALJ's decision is direct, "but we play an 'extremely limited' role."
*Simila v. Astrue,* 573 F.3d 503, 513-14 (7th Cir. 2009). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). Just as "'[n]o trial is perfect,' . . . no administrative hearing or opinion is either[;] thus, in analyzing an ALJ's decision, a reviewing court is to look for 'fatal gaps or contradictions' and not 'nitpick' in search of essentially meaningless missteps." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1965 (N.D. Ill. 2011).

## C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq*., and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

5

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and

considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.     ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2006, and that Plaintiff had not engaged in substantial gainful activity since June 8, 2000, the alleged onset date. (Tr. at 25.) At step two, the ALJ found that Plaintiff's degenerative disc disease and anxiety were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 26-27.) At step four, the ALJ found that Plaintiff could not perform her past relevant work. (Tr. at 29.) At step five, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 27-29.) The ALJ also found that Plaintiff was a younger individual (i.e., between the ages of 18 and 49) on the alleged disability onset date. (Tr. at 30.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 31.)

### E.     Administrative Record

### 1.     Medical Evidence

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was injured in early 2000 while working at a sheriff's office and has reported chronic back pain since that time. (Tr. at 325.) Plaintiff was treated by Richard W. Lingenfelter, M.D., for her chronic low back pain. (Tr. at 211-81.)

In June 2000, x-rays of Plaintiff's thoracic and lumbo-sacral spine were "normal." (Tr. at 301.) On November 17, 2000, and January 26, 2001, Dr. Lingenfleter performed a "fluoroscopically guided lumbar epidural steroid block," which Plaintiff tolerated well and she was

able to ambulate easily unassisted after the procedures. (Tr. at 231-32, 233-34, 373-74, 377-78.)

On February 9, 2001, and December 15, 2003, Dr. Lingenfelter performed "[f]luoroscopically guided facet blocks, right L3-L4, L4-L5, and L5-S1, via the medial branch nerve." (Tr. at 224-25, 226-27, 375-76.) Plaintiff was able to ambulate easily unassisted and tolerated the procedures well. (*Id.*)

On May 25, 2001, an MRI of Plaintiff's lumbar spine showed "central disk protrusion without any significant mass effect" at L4-L5 and "smaller disk protrusion without any significant mass effect" at L5-S1. (Tr. at 295, 299.) The MRI also showed "[n]o evidence of herniated disk" and that the "foramina are patent at all levels." (*Id.*)

On June 11, 2001, Plaintiff was referred by Collette Mercier, M.D., to Waheed Akbar, M.D., who reviewed an MRI of Plaintiff's lumbar spine showing "mild to moderate" "central disc protrusion" at L4/L5, but was otherwise "satisfactory." (Tr. at 289.) Dr. Akbar noted that "[n]eurologically, she is grossly intact in the lower extremities[.]" (*Id.*) Dr. Akbar diagnosed degenerative disc disease of the lumbar spine, recommended "[s]ymptomatic treatment" and "encouraged [Plaintiff] strongly to quit smoking and improve her overall prognosis" by "encourag[ing] [her] to walk as an exercise." (Tr. at 290.)

On July 17, 2002, an MRI of the lumbar spine showed a "small centrally herniated disk at T12-L1 lateralizing to right side. This is touching the conus. This has become worse since 5/25/01." (Tr. at 303, 352, 424, 490.) The MRI also revealed "[d]evelopment of small centrally herniated disk at L4-5 since previous examination." (*Id.*)

On November 20, 2003, Teresa Pietrus, M.D., examined Plaintiff and noted, "I think that she is guarding when I tried to do [straight leg raising,] so it is difficult exam actually." (Tr. at

311.) Dr. Pietrus recommended "treatment by Pain Clinic including possibly some contact of pain medications." (*Id.*)

On January 20, and February 3, 2004, Plaintiff underwent fluoroscopy guided lumbar epidural steroid injections with Dr. Lingenfelter. (Tr. at 220, 222.) Plaintiff ambulated easily unassisted and tolerated the procedures well. (*Id.*) On January 20, 2004, Dr. Lingenfelter noted that Plaintiff "was upset that she did not get her Vicodin refilled, which she allegedly was promised by Carol . . . . A discussion will be held with Carol before this is done." (Tr. at 223.)

On February 18, 2004, Dr. Lingenfelter noted that Plaintiff "walks very slowly and gingerly in the office here, in going up the hallway, but I did have an opportunity to be in the front reception area and I watched her walk to her car. The patient's pace was dramatically improved as she was walking outside, whether it is because of the weather being colder so she increased her speed at that time, I do not know." (Tr. at 254.)

On March 1, 2004, Dr. Lingenfelter performed "[f]luoroscopically guided facet blocks, right and left L3-L4, L4-L5, and L5-S1, via the medial branch nerve." (Tr. at 217.) Plaintiff was "able to ambulate easily unassisted" and was instructed to make an appointment to be "evaluate[d] for starting physical therapy . . . No more steroids for at least 6 months." (Tr. at 219.)

On March 18, 2004, Dr. Lingenfelter noted that Plaintiff "continues to use Soma, Neurontin, Elavil, Xanax, Bextra, and Ultracet for pain. She is actually at this visit asking to have something stronger, such as Vicodin. The patient is also here today with 2 bottles of medications that she has been attempting to use for weight management . . . [that] she ordered from the television . . . ." (Tr. at 251.) Dr. Lingenfelter stated that Plaintiff "is very difficult to assess . . . because she is tender in most areas that I palpate her, even if I grab her arm, she would naturally jump, but then would not show any pain in some of the areas that I would have expected to show

pain." (Tr. at 252.) Dr. Lingenfelter noted that he "discontinued her Soma and did prescribe Flexeril 10 mg t.i.d. and continued her Ultracet and Bextra. . . . The patient is very interested in resuming her Vicodin, but it was further discussed and this was not recommended." (Tr. at 252.)

On April 14, 2004, Dr. Lingenfelter performed a "[f]luoroscopically guided lumbar radiofrequency thermocoagulation of right L3-L4, L4-L5, and L5-S1 via the medial branch nerve." (Tr. at 214.) It was noted that Plaintiff was "able to ambulate easily unassisted, tolerated the procedure well, and was discharged in satisfactory condition . . . ." (Tr. at 216.)

On June 21, 2004, Dr. Lingenfelter noted that Plaintiff's "pain is better" and that she "spent an enormous amount of exam time telling me about her SIDS support group and all of the speaking engagements that she does." (Tr. at 244.) He also noted that Plaintiff was "very involved in softball with her children. It sounds as if she is a coach." (*Id.*)

On July 20, 2004, Dr. Lingenfelter noted:

> She is actually here today wanting to know if she can have her left side radiofrequency completed. With further investigation, I have determined that the patient has not followed through with physical therapy. She has had this prescribed and has been encouraged to go through it; however, she states that she was not treated appropriately at the facility and they failed to follow through by calling her for a return appointment, so she just disregarded this. I did let her know that before we proceed with left-sided facets, we would want her to proceed with physical therapy and then we would look at doing facet injections, if she does not have any response with the physical therapy itself. The patient was very upset with this. She states that she thought we were treating her unfairly. However, I did explain to her that this is something that we thoroughly believe in, physical therapy would be the second half of her treatment, and I also mentioned that if she wanted us to continue to care for her, she certainly needed to try what we prescribed. She did verbalize understanding and stated that she would take a new prescription for physical therapy and would follow through.

(Tr. at 242.)

On September 16, 2004, Dr. Lingenfelter stated that Plaintiff "was last seen in July of 2004 and at that time I had discussed with her that she really needed to go through physical therapy

10

before we could ascertain whether she should undergo another facet injection . . . [but] she was very reluctant to go . . . ." (Tr. at 240.) Dr. Lingenfelter also noted that Plaintiff "demonstrates very high anxiety. She has difficulty finding some of the words that she wants to use. She is very excitable and jumps from one conversation to the next, without ending the first, which she has demonstrated on every appointment that I have had with her." (Tr. at 240.)

On November 29, 2004, Dr. Lingenfelter told Plaintiff, "I really would like her to pursue physical therapy since it is something that would offer her some additional pain control; however, the patient has been very resistant . . . ." (Tr. at 239.)

On March 21, 2005, Dr. Lingenfelter noted that Plaintiff "was supposed to go through physical therapy, but, due to many stresses in her life, she has been unable to fulfill this obligation." (Tr. at 235.) Dr. Lingenfelter noticed upon examination that Plaintiff "has applied a lot of heat to her low back. . . . The patient adamantly denied this at the beginning but then stated that she does use heat . . . ." (Tr. at 235-36.)

On May 23, 2005, Plaintiff underwent another "[f]luroscopically guided radiofrequency thermocoagulation of the right L3-L4 and L4-L5 facets via the medial branch nerve" with Dr. Lingenfelter. (Tr. at 277.)

On April 1, 2005, Plaintiff was assaulted by her husband when he "threw her into a door." (Tr. at 338.) On August 16, 2005, Plaintiff had her arm in her husband's car window and her husband drove off, dragging her "approximately four car lanes." (Tr. at 334.) On that same day, x-rays of Plaintiff's cervical spine showed "[s]traightening of the normal cervical lordosis. No evidence of fracture or subluxation." (Tr. at 284.)

On December 11, 2007, Plaintiff was examined by Michelle McLean, M.D., who observed that Plaintiff's "deep tendon reflexes were difficult to ascertain because she kept contracting the

muscles of her thighs. The patient could walk and stand on her toes and heels and had normal rectal tone." (Tr. at 326.) Dr. McLean also noted that although she "provide[d] [Plaintiff] with a shot of Dilaudid as well as Norflex[,]" Plaintiff "seems very frustrated by the point that I would not provide her with Soma." (*Id.*)

On January 2, 2008, an MRI of the lumbar spine showed "[n]o evidence of significant disk protrusion, central canal stenosis or neural foramina compromise. Small radial test at the L4-L5 level, redemonstrated, similar to the exam of July 2002. Mild degenerative intervertebral changes as described above, stable in appearance." (Tr. at 328-29, 422-23, 426-27, 492-93.)

Plaintiff was also treated at the Jane Street Academic Community Health Center. (Tr. at 379-432.) Notes indicate that Plaintiff was consistently "oriented x3," was "anxious," and that "med list - declined." (Tr. at 380, 382-86, 389, 406, 412, 415.) On April 9, 2009, Plaintiff's physical examination showed that all musculoskeletal areas were normal, muscle tone amd strength was 5+/5+ but that some areas were reported to be "tender." (Tr. at 384.)

Plaintiff was examined at the request of Disability Determination Services ("DDS") by Bruce Fowler, Psy.D., L.P., on October 27, 2009. (Tr. at 435-40.) Dr. Fowler diagnosed post-traumatic stress disorder based on Plaintiff's ex-husband's abusive behavior, assessed a GAF score of 58 and gave a "[f]air to good" prognosis. (Tr. at 439.) Dr. Fowler concluded that Plaintiff "is able to understand, retain, and follow instructions of at least moderate complexity. She does not appear to have any intellectual deficits that would inhibit her job performance or permit her to make independent work-related decisions. However, the symptoms of PTSD are significant enough that this would interfere with her ability to perform any job on a consistent and reliable basis." (*Id.*)

Plaintiff was also examined at the request of DDS by Andrew Sears, M. D., on October 30, 2009. (Tr. at 442-44.) Dr. Sears concluded that "[w]ith the degree of pain and discomfort this patient is experiencing, it is highly doubtful that she can return to her previous occupation. . . . She would benefit from further physical therapy, but she has already had four episodes of physical therapy." (Tr. at 444.)

On November 4, 2009, five views of the lumbar spine showed "no alignment abnormalities in the lumbar spine. Vertebral height, interspacing, and alignment are normal. There are no demonstrated arthritic changes. The sacroiliac joints have a normal appearance." (Tr. at 445.) Chest x-rays taken on the same day were also "normal[.]" (Tr. at 446.)

Seven views of the cervical spine and three views of the thoracic spine taken on January 12, 2010, showed "no acute findings" and "no gross abnormalities." (Tr. at 519.)

An MRI of the cervical spine taken on February 3, 2010, showed "[l]oss of cervical lordosis may represent secondary to muscle spasm. However, I do not see any evidence of herniated disk." (Tr. at 495.)

2.    **Assessments**

A Physical RFC Assessment was completed by Matthew Branch, a single decisionmaker ("SDM"), on November 6, 2009. (Tr. at 451-58.) The assessment concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. at 452.) It was determined that Plaintiff could only occasionally climb ladders or scaffolds but that she could frequently perform other postural functions. (Tr. at 453.) There were no manipulative, visual, communicative, or environmental limitations established. (Tr. at 454-55.)

A Psychiatric Review Technique was completed on November 11, 2009, by Ron Marshall, Ph.D. (Tr. at 459-72.) Dr. Marshall diagnosed anxiety-related disorder based on recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. (Tr. at 459, 464.) Plaintiff was found to be mildly restricted in activities of daily living and moderately limited in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. at 469.)

A Mental RFC Assessment completed on the same day by Dr. Marshall concluded that Plaintiff is moderately limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 473-74, 477-78.) Plaintiff was otherwise not significantly limited in understanding, memory, or sustained concentration and persistence. (*Id.*) Plaintiff was also determined to be moderately limited in the ability to interact appropriately with the general public, to respond appropriately to changes in the work setting, and to travel in unfamiliar places or use public transportation, but was otherwise not significantly limited in social interaction or adaptation. (Tr. at 474, 478.) The assessment concluded that Plaintiff "[r]etains ability to do rote tasks within medical limitations. Able to follow instructions. May work better with brief interactions with others." (Tr. at 475, 479.)

### 3.    Plaintiff's Report and Testimony

In her Daily Function Report, Plaintiff indicated that she performs the following tasks each day:

> I get up and take my meds make/eat breakfast with my kids. Try to complete some chores (dust, start laundry) lay down and read. Get up take meds make/eat lunch with the kids. Sit outside if warm come in lay down watch History channel or News channel. Get up make/eat dinner. Watch movie or play game with kids. Read to them. Take my meds go to bed.

(Tr. at 189.) Plaintiff also indicated that she helps her children with their homework, is able to take care of her personal care needs, does not need reminders, prepares meals daily, but that she cannot stand up long, only for "short intervals." (Tr. at 191-92.) Plaintiff also indicated that she goes outside three to four times per week if the weather permits, is able to drive and ride in a car, is able to shop in stores for one-half hour at a time, enjoys reading, using the computer, watching television, scrapbooking, and reading to her children. (Tr. at 192-93.) Plaintiff also stated that she enjoys talking with others on a weekly basis. (Tr. at 193.)

At the administrative hearing, Plaintiff testified that she has a driver's license but that she can only drive on a limited basis because the medication she takes makes her tired. (Tr. at 39-40.) She stated that it is difficult to "sit for long periods of time without having to be in a prone position with like a pillow between my knees, et cetera." (Tr. at 40.) Plaintiff stated that she can sit for "20 minutes, maybe a half an hour, but it's difficult. I have to stand or lie down or get to a comfortable position." (Tr. at 41.) Plaintiff also indicated that she can stand and walk for "[m]aybe 10, 15" minutes and that the heaviest thing she can lift around the house is a "[n]ewspaper, book." (*Id.*) When asked if she could lift a gallon of milk, Plaintiff responded, "Two-handed, maybe. I normally get the small ones. Half gallon." (*Id.*) Plaintiff also testified that she has "panic attacks" "when I'm dealing with a lot of public . . . . Just a sense of nervousness on a regular basis." (Tr. at 40.) She testified that she has "maybe three" attacks on a "normal day, but if I have to go out into public, then it's exacerbated." (*Id.*) At the time of the hearing, Plaintiff's three children that

"help out a lot" were 19, 16, and 12 years of age. (Tr. at 41.)  Plaintiff stated that she spends her day napping and watching television. (*Id.*)

### 4.   Vocational Testimony

The ALJ asked the vocational expert ("VE") to assume a person with Plaintiff's background who is

> able to perform light work as defined by the regulations, except that she can only occasionally climb ladders, ropes or scaffolds, she can frequently climb ramps or stairs, and she can frequently balance, stoop, crouch, kneel or crawl. She is limited to simple, routine, and repetitive tasks and work that involves only occasional interaction with the public or coworkers.

(Tr. at 45.) The VE responded that such a person could perform the 4,200 dishwasher, 3,500 office clerk, and 9,500 packer jobs available in the lower peninsula of Michigan. (Tr. at 45-46.) The VE indicated that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 46.)

### F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of light work. (Tr. at 27-29.)

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 8.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

### a.    Credibility Assessment

Plaintiff asserts that the "Commissioner erred as a matter of law in assessing Nina Hohman's credibility and by failing to properly evaluate the medical records of evidence and thereby, forming an inaccurate hypothetical that did not accurately portray Nina Hohman's impairments." (Doc. 8 at 6-17.)

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377,

17

379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When

weighing credibility, an ALJ may give less weight to the testimony of interested witnesses.

*Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore

incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999

WL 98645, at *3 (6th Cir. Feb. 11, 1999). However, "[i]f an ALJ rejects a claimant's testimony

as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective

symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective

complaints to be considered disabling, there must be (1) objective medical evidence of an

underlying medical condition, and (2) objective medical evidence that confirms the severity of the

alleged disabling pain arising from that condition, or, objectively, the medical condition is of such

severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y

of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan

v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable

physical or mental impairment exists that could reasonably be expected to produce the individual's

pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to

exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then

determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine

the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.*

Although a claimant's description of his physical or mental impairments alone is "not enough to

establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a),

"[a]n individual's statements about the intensity and persistence of pain or other symptoms or

about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(I)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; SSR 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); SSR 96-7p, at *5.

In the instant case, the ALJ thoroughly considered all the relevant factors and determined that Plaintiff's complaints of disabling impairments were not fully credible to the extent that they were inconsistent with the RFC assessment. (Tr. at 28-29.) The ALJ expressly noted some discrepancies in Plaintiff's reported condition and the medical evidence. For instance, the ALJ noted that although Plaintiff reported that her primary care physician diagnosed PTSD, the primary care physician's records reference only anxiety. (Tr. at 25-26; Tr. at 240, 435-40.) In addition, the ALJ noted that although Plaintiff reported to the consultative examiner that she had several ruptured discs in her back, the medical findings do not support that statement. (Tr. at 29; Tr. at 442-44.) The ALJ also referred to Plaintiff's treating physician's observation that although Plaintiff "adamantly" denied using heat on her back, she later admitted that she did. (Tr. at 29; Tr. at 235-36.) Finally, the ALJ also observed that although Plaintiff indicated that it was difficult for

19

her to sit for twenty minutes, she sat through the hearing of approximately twenty minutes without any apparent discomfort. (*Id.*)

In addition, the examiner stated that Plaintiff "would benefit from further physical therapy, but she has already had four episodes of physical therapy." (Tr. at 444.) However, as noted by Plaintiff's treating physician, despite continual urging, Plaintiff refused to participate in physical therapy. (Tr. at 235, 239, 240, 242.) Thus, Plaintiff's reporting that she had participated in four "episodes" or courses of physical therapy is not accurate.

Moreover, although Plaintiff testified that she has around three "panic attacks" each day and avoids going out in public (Tr. at 40), Dr. Lingenfelter's notes indicate that Plaintiff "spent an enormous amount of exam time telling me about her SIDS support group and all of the speaking engagements that she does." (Tr. at 244.) He also noted that Plaintiff was "very involved in softball with her children" and "[i]t sound[ed] as if she is a coach." (*Id.*)

Dr. Lingenfelter observed that Plaintiff "walks very slowly and gingerly in the office here, in going up the hallway, but I did have an opportunity to be in the front reception area and I watched her walk to her car. The patient's pace was dramatically improved as she was walking outside, whether it is because of the weather being colder so she increased her speed at that time, I do not know." (Tr. at 254.) Dr. Lingenfelter also stated that Plaintiff "is very difficult to assess . . . because she is tender in most areas that I palpate her, even if I grab her arm, she would naturally jump, but then would not show any pain in some of the areas that I would have expected to show pain." (Tr. at 252.) In addition, Dr. Pietrus stated, "I think that she is guarding when I tried to do [straight leg raising] so it is difficult exam actually." (Tr. at 311.) Finally, Dr. McLean observed that Plaintiff's "deep tendon reflexes were difficult to ascertain because she kept contracting the muscles of her thighs." (Tr. at 326.)

20

I suggest that the ALJ's decision to discount Plaintiff's credibility is supported by substantial evidence for these reasons alone. I further suggest that, for the reasons discussed under the ALJ's RFC assessment below, the medical record supports the ALJ's findings that Plaintiff's condition would not reasonably be expected to produce disabling pain or symptoms, nor would the symptoms limit the claimant's ability to do basic work activities within the defined RFC.

### b.    RFC Findings

I suggest that substantial evidence supports the ALJ's RFC analysis as summarized in the hypothetical:

> is able to perform light work as defined by the regulations, except that she can only occasionally climb ladders, ropes or scaffolds, she can frequently climb ramps or stairs, and she can frequently balance, stoop, crouch, kneel or crawl. She is limited to simple, routine, and repetitive tasks and work that involves only occasional interaction with the public or coworkers.

(Tr. at 45.)

The objective medical evidence does not reveal any disabling conditions. X-rays of Plaintiff's thoracic and lumbo-sacral spine were "normal" on June 9, 2000. (Tr. at 301.) On May 25, 2001, an MRI of Plaintiff's lumbar spine showed "central disk protrusion without any significant mass effect" at L4-L5 and "smaller disk protrusion without any significant mass effect" at L5-S1. (Tr. at 295, 299.) The MRI also showed "[n]o evidence of herniated disk" and that the "foramina are patent at all levels." (*Id.*) On July 17, 2002, an MRI of the lumbar spine showed "small centrally herniated disk at T12-L1 lateralizing to right side . . . [and] touching the conus . . .[which had] become worse since 5/25/01." (Tr. at 303, 352, 424, 490.) The MRI also revealed "[d]evelopment of small centrally herniated disk at L4-5 since previous examination." (*Id.*) On January 2, 2008, an MRI of the lumbar spine showed "[n]o evidence of significant disk protrusion, central canal stenosis or neural foramina compromise. Small radial test at the L4-L5 level,

redemonstrated, similar to the exam of July 2002. Mild degenerative intervertebral changes as described above, stable in appearance." (Tr. at 328-29, 422-23, 426-27, 492-93.) On November 4, 2009, five views of the lumbar spine showed "no alignment abnormalities in the lumbar spine. Vertebral height, interspacing, and alignment are normal. There are no demonstrated arthritic changes. The sacroiliac joints have a normal appearance." (Tr. at 445.) Chest x-rays taken on the same day were also "normal[.]" (Tr. at 446.) Seven views of the cervical spine and three views of the thoracic spine taken on January 12, 2010, showed "no acute findings" and "no gross abnormalities." (Tr. at 519.) An MRI of the cervical spine taken on February 3, 2010, showed "[l]oss of cervical lordosis may represent secondary to muscle spasm. However, I do not see any evidence of herniated disk." (Tr. at 495.) I suggest that such mild changes are inconsistent with disability and, thus, support the ALJ's RFC findings.

As to mental impairments, Plaintiff was given prescription medication from Dr. Lingenfelter for anxiety but the Jane Street Health Center notes indicate that Plaintiff was consistently "oriented x3," and was "anxious" once. (Tr. at 380, 382-86, 389, 406, 412, 415.)

Plaintiff's treatment for her physical and mental impairments was modest, consisting of prescription medication and some epidural steroid injections, facet blocks, and radiofrequency treatments. (Tr. at 214, 217, 219-20, 222, 224-27, 277, 231-34, 373-78.) Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

Neither Plaintiff's treating physicians nor the examining or non-examining physicians opined that Plaintiff was unable to perform simple, light work, with limited contact with the public. Dr. Fowler opined that Plaintiff was "able to understand, retain, and follow instructions of at least moderate complexity" and that she did "not appear to have any intellectual deficits that

22

would inhibit her job performance or permit her to make independent work-related decisions." (Tr. at 439.) I suggest that Dr. Fowler's comment that Plaintiff's "symptoms of PTSD are significant enough that this would interfere with her ability to perform any job on a consistent and reliable basis," (*id.*), is not entitled to any weight since a "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (citation omitted). In addition, Dr. Marshall concluded that Plaintiff "[r]etain[ed] [the] ability to do rote tasks within medical limitations," was "[a]ble to follow instructions," but might "work better with brief interactions with others." (Tr. at 475, 479.) Moreover, the SDM concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. at 452.)

I therefore suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that she makes meals for her children, helps her children with their homework, takes care of her personal care needs, does not need reminders, goes outside three to four times a week if the weather permits, drives and rides in cars, shops in stores for one-half hour at a time, enjoys reading, uses the computer, watches television, does scrapbooking, reads to her children, and enjoys talking with others. (Tr. at 191-93.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3.     Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.*, 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗

CHARLES E. BINDER
United States Magistrate Judge

Dated: May 16, 2013

24

**<u>CERTIFICATION</u>**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  May 16, 2013                         By_____s/Patricia T. Morris_____
                                                              Law Clerk to Magistrate Judge Binder